UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID B. NEWMAN, et al.

                              Plaintiffs,

          v.

FAMILY MANAGEMENT CORPORATION, et al.

                              Defendants.

---

**OPINION
& ORDER**

08 Civ. 11215 (LBS)

SAND, J.

    Plaintiffs in this case are investors in the FM Low Volatility Fund ("FM Fund"), a "sub-feeder" fund, the assets of which were invested in "Feeder Funds" that in turn invested in Bernard L. Madoff Securities LLC ("BMIS").  Plaintiffs bring claims against Defendants associated with the FM Fund and against the Feeder Funds in which the FM Fund invested.[1]  All Defendants have moved to dismiss the Second Amended Complaint ("SAC").  For the following reasons, the motions are granted.

**I.  Background**

**a.  Madoff's Fraud**

---

[1] Several other actions before this Court and other courts relate to losses sustained by Feeder Funds that invested with Madoff.  This Court recently issued a ruling on motions to dismiss in *In re Beacon Associates Litigation*, No. 09 Civ. 777 (LBS), 2010 WL 3895582, at *34 (S.D.N.Y. Oct. 5, 2010), a case brought on behalf of investors in the Beacon Fund.  Nominal Defendant FM Fund is included in the Plaintiff class of that case against the Beacon, Ivy, and Bank of New York ("BONY") Defendants, among others.  Plaintiffs in the instant case and Defendant Ivy have stipulated that they would be bound by the outcome in *In re Beacon*.
    The Beacon Fund's liquidation forms the subject matter of another action before this Court and Magistrate Judge Peck.  *See Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*, No. 09 Civ. 6910 (AJP), 2010 WL 2947076 (S.D.N.Y. July 27, 2010); *Rounds v. Beacon Assocs. Mgmt. Corp.*, No. 09 Civ. 6910 (LBS), 2009 WL 4857622 (S.D.N.Y. Dec. 16, 2009).
    Also before this Court are two other cases brought against sub-feeder funds that invested in Beacon.  *Wolf Living Trust v. FM Multi-Strategy Investment Fund, L.P.*, 09 Civ. 1540 (S.D.N.Y. Feb. 2, 2009); *Saltz v. First Frontier, L.P.*, 10 Civ. 964 (S.D.N.Y. Feb. 2, 2010).

The basic facts surrounding Madoff's historic Ponzi scheme are now well known. Madoff was a prominent and respected member of the investing community, whose investment company, BMIS, had operated since approximately 1960.   Madoff claimed he utilized a "split-strike conversion strategy" to produce consistently high rates of return on investment.  This strategy supposedly involved buying a basket of stocks listed on the Standard & Poor's 100 Index and hedging through the use of options.

Since at least the early 1990s, Madoff did not actually engage in any trading activity. Instead, he generated false paper account statements and trading records.  If a client asked to withdraw her money, Madoff would pay her with funds invested by other clients.  Madoff deceived countless investors and professionals, as well as his primary regulators, the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

On December 11, 2008, Madoff was arrested by federal authorities for operating a multi-billion dollar Ponzi scheme.  On March 12, 2009, Madoff pleaded guilty to securities fraud and related offenses arising out of his Ponzi scheme.  On March 18, 2009, the United States Attorney's Office indicted BMIS's accountant, David Friehling of Friehling & Horowitz, CPAs, P.C., on charges of securities fraud, filing false audit reports, and related offenses.  On August 11, 2009, BMIS's Chief Financial Officer, Frank DiPascali, pleaded guilty to conspiracy to commit securities fraud and related offenses.  On November 13, 2009, the United States Attorney's Office charged two computer programmers with aiding Madoff's scheme by developing software to generate false trading data.  On May 11, 2010, the Attorney General of the State of New York filed a civil complaint against Defendant Ivy in the Supreme Court of the

State of New York, alleging that Ivy and individuals related to it committed fraud and related offenses.

**b.  The FMC Defendants and Plaintiffs' Investment in the FM Fund**

Defendant Family Management Corporation ("FMC") is a registered investment adviser that provides wealth management and investment advisory services to its clients.  As of May 31, 2008, FMC had approximately $1.3 billion in assets under management.  Defendant Seymour Zises is FMC's President and Chief Executive Officer, and Defendant Andrea Tessler is FMC's Managing Director and Chief Operating Officer (collectively with FMC and Zises, the "FMC Defendants").

Nominal Defendant the FM Fund is a Delaware limited partnership.  Defendant FMC serves as general partner of the FM Fund.  During the relevant time period, Defendants Zises and Tessler were co-heads of the FM Fund's Investment Committee and were charged with monitoring the performance of the FM Fund's investments on an ongoing basis and for reviewing relevant market conditions and economic trends.  They made all investment, trading, and allocation decisions for the Fund, including the decision to invest in the Andover, Beacon, and Maxam Funds.

Participation in the FM Fund was offered through an Offering Memorandum dated April 2008 ("FM OM") and attached Form ADV dated May 2008 ("Form ADV").  Investment in the FM Fund was open only to sophisticated, accredited investors.  Lebersfeld Decl. Ex. B ("FM OM"), at (i).  Plaintiffs are limited partners in the FM Fund who invested $610,000 in limited partnership interests between April 8, 2008 and December 11, 2008.  The limited partners paid an annual investment management fee of 1.4% of assets to the FM Fund and were liable for

3

management fees and performance fees charged by the Feeder Fund Defendants.[2]  The limited partners were "not . . . able to readily participate in the management of the Fund, and [had] limited voting rights including no right to remove the general partner."  FM OM at 17. Redemption was only available on the 31st of December each year or on different terms at FMC's discretion.

The OM disclosed that the Fund would invest through other "Investment Vehicles," such as hedge funds and hedge "funds-of-funds" rather than trading on its own.  FM OM at (i). According to the offering materials, including Form ADV, Defendant FMC would conduct "initial and ongoing due diligence on all Third Party Managers and their investment vehicles." Basar Decl. Ex. C ("Form ADV"), at Schedule F.  FMC lists various sources of investment information, including annual reports, SEC filings, financial publications, research materials, and on-site due diligence.  However, the FM OM stated that the Investment Vehicles would be controlled by outside Managers, and that "the General Partner must ultimately rely on each Manager to operate in accordance with the investment strategy . . . and the accuracy of the information provided to the Fund by such Manager."  Thus, the Fund might sustain losses if "a Manager does not operate in accordance with its investments strategy . . .  or if the information furnished by a Manager is not accurate."  FM OM at 9.

The FM OM stated the FM Fund would invest in no fewer than three Investment Vehicles, with no more than 35% invested in any one Investment Vehicle.  FM OM at 4.  It

---

[2] Plaintiffs allege Defendant FMC collected two layers of fees, one as investment adviser and another as general partners of the FM Fund.  SAC ¶ 100.  However, they provide no further information regarding the general partner fee and in fact seem to agree that they were charged a total of 1.4% in fees.  *See* SAC ¶ 131.  The FMC Defendants cite the Form ADV and the Statement of Management Fees provided to the Plaintiffs as stating Plaintiffs were subject only to a 1.4% management fee and excluded from the additional 1% fee "normally charged to discretionary assets."  *See* FM Fund Reply to Pls.' Omnibus Opp'n to Defs.' Mot. Dismiss 6.  Although the amount of fees charged is not clear, the outcome of this decision is not affected.

4

warned investors that this division is no way guaranteed diversification, as the Managers "at times may take positions on behalf of the Fund which are the same, or opposite from, the positions taken by other Managers."  FM OM at 9.  The FM OM also advised that "a significant portion of the overall portfolio of the Investment Vehicles invested in by the Fund" would likely be invested in a strategy focused on "the purchase of [large capitalization] equity securities and the concurrent use of equity or index options in order to hedge the equity portfolio," the split-strike conversion strategy purportedly used by Madoff.  FM OM at 4–5.

Under the Limited Partnership Agreement ("FM LPA"), Plaintiff investors agreed to exculpate Defendant FMC and its officers and directors from any liability to the Fund or its limited partners for any act or omission except those that "constitute[] bad faith, gross negligence, fraud or willful misconduct."  Lebersfeld Decl. Ex. D ("FM LPA") § 5.5.1.

The FMC Defendants invested the FM Fund's assets[3] in three funds: Andover, Beacon, and Maxam.  These funds invested with Madoff to varying degrees, leading the FM Fund and the Plaintiffs as limited partners to lose a large portion of its investments.  Shortly after Madoff's arrest, FMC informed the Fund's investors that it would dissolve the Fund.

**c.  The Maxam Defendants**

Defendant Maxam Absolute Return Fund, L.P. ("Maxam Fund") was created in or about July 2006 and invested exclusively with Madoff.  Maxam Capital GP, a Delaware limited liability corporation, was the general partner of the Maxam Fund.  Defendant Maxam Capital Management Limited ("MCM") is an investment management and consulting firm, which served as the administrator of the Maxam Fund, and Defendant Maxam Capital Management LLC

---

[3] There is some disagreement as to how much money was actually exposed to Madoff.  *See* Pls.' Omnibus Opp'n to Defs.' Mot. Dismiss ("Pls.' Opp'n") 10 n.12.  At some points in their Complaint, Plaintiffs state 60% of the FM Fund's assets were invested with the Andover, Beacon, and Maxam Funds.  At other points, the Complaint states 60% of the Fund's assets were invested with Madoff.  *See* SAC ¶¶ 103–04.

("Maxam Capital") is the investment manager of the Maxam Fund.[4]  Defendant Sandra Manzke

is the founder, principal and Chief Executive Officer of Maxam GP and MCM.

The Maxam Fund was offered to investors through a Private Placement Memorandum.

Tendler Decl. Ex. A ("Maxam PPM").  The Maxam PPM indicated that there was "only one

Broker Dealer trading [the Maxam Fund's] assets on a discretionary basis," and that "it is likely

that only the services of the present Broker Dealer will be used."  Maxam PPM at 1.  This Broker

Dealer was BMIS.  The Maxam PPM indicated that Maxam would perform due diligence, but

that it was entitled to rely on information supplied by the Broker Dealer and was "not required to

undertake any due diligence to confirm the accuracy" of such information.  Maxam PPM at 17.

The Maxam Defendants received management and administration fees calculated as a percentage

of the investments of the limited partners in Maxam, including the FM Fund.  Maxam PPM at

10.  The Fund lost virtually all of its value when Madoff's Ponzi scheme collapsed.

### d.  The Andover Beacon Defendants

Defendants Andover Associates LLC ("Andover Fund") and Beacon Associates LLC I

("Beacon Fund") are hedge "funds of funds" that grouped smaller investors together to meet the

minimum net worth requirements for investing directly with BMIS.  The Funds were formed by

Defendants Joel Danziger and Harris Markhoff in conjunction with Larry Simon, president and

CEO of Ivy Asset Management, who had personal relationships with Madoff, Danziger, and

Markhoff.  Defendant Andover Associates Management Corp. ("AAMC"), a New York

corporation, is the manager of the Andover Fund, and Defendant Beacon Associates

Management Corp. ("BAMC") is the manager of the Beacon Fund.  Defendant Danzinger served

---

[4] There is some disagreement as to whether MCM or MCML, a Cayman Islands exempted company, was the administrator of the Maxam Fund.  Maxam's Mot. Dismiss 4.  It is unnecessary to resolve the question at this juncture.

as President and Director of Andover Associates and BAMC.  Defendant Markhoff served as Vice President, Secretary, Treasure, and Director of the same.

In February 1995, BAMC and Ivy Asset Management entered into a "consultant agreement" under which Ivy Asset Management was compensated for introducing BAMC to Madoff and was to receive 50% of the management fees collected by BAMC for investing the Beacon Fund's assets with Madoff.  On January 1, 2006, BAMC and Ivy executed a new advisory contract, which was not disclosed to Plaintiffs.  This contract explicitly excluded Madoff from the managers Ivy agreed to research, monitor, meet with, and evaluate.  The contract stated that "[BAMC] has expressly requested that Ivy not monitor or evaluate or meet with any representatives of Madoff including Bernard L. Madoff."  Liman Decl. Ex. B, C § 3(d).

Participation in the Andover and Beacon Funds was offered to investors through confidential Offering Memoranda ("OMs").  The Beacon OM was released in 2004, followed by the Andover OM in 2008 (together the "Andover Beacon OMs").  Plaintiffs allege the two OMs are "substantially the same in all relevant respects."  SAC ¶ 143.  The Andover Beacon OMs represented that BAMC and AAMC retained sole discretion to invest and reallocate the Funds' assets, and would do so after consultation with Ivy.  The managing members were responsible for selecting investment managers, such as BMIS, and for "monitoring the Managers' performance and their adherence to their stated investment strategies and objectives."  Rosenfeld Decl. Ex. C ("2004 OM"), at 10.  The Andover Beacon OMs contained extensive cautionary language about the risks of investing with the Andover and Beacon Funds.  The OMs explained that the investments would not be diversified, but notified investors that a "significant portion of the Company's assets are allocated to a strategy adopted by the Managing Member involving a portfolio of Large Cap Stocks hedged with options ('Large Cap Strategy')."  2004 OM at 1.

The Beacon and Andover Defendants received management fees at an annual rate of 1.5% of the value of each member's capital account and 1% of each year's net profits. The Andover and Beacon Funds had approximately 23% and 74% of their assets invested with Madoff, respectively.

### e. The Ivy Defendants and BONY

Defendants Ivy Asset Management Corporation ("Ivy") is a limited liability company and wholly-owned subsidiary of Defendant Bank of New York Mellon Corporation ("BONY"). BONY is a global financial services company. Ivy provides clients with investment services, including providing links to investment managers, as well as advisory, monitoring, and administrative services. Ivy had a consulting agreement with the Beacon and Andover Funds, under which it provided these services and served as the Funds' link to BMIS. While Ivy was responsible for some monitoring and evaluation for the Beacon and Andover Funds, Madoff was expressly excluded from this arrangement. *See supra* p. 7.

### f. John Doe Defendants

In addition to the Defendants named in the SAC, Plaintiffs assert claims against "Defendant John Does 1-100, whose true identities, roles and capacities have yet to be ascertained, but may include the immediate family members of Defendants Danziger and Markhoff, the members of the Investment Committee of the Fund, the members of the Advisory Boards for the Feeder Fund Defendants, and other potential control persons and employees of certain Defendants, including those of Ivy Asset Management and BONY, hedge funds, hedge fund managers, brokerage firms and fiduciaries to the Funds who participated, exploited and perpetrated the wrongdoing alleged herein." SAC ¶ 44.

### g. Alleged "Red Flags" Suggesting Madoff Was a Fraud

8

Plaintiffs allege that many publicly available facts suggested that Madoff was a fraud, and that many private investors decided Madoff was suspicious after examining the publicly available data.  The alleged red flags include, among others, "(a) the fact that Madoff offered consistent investment returns, beyond reasonable investment benchmarks, in both up and down markets; (b) the fact that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts; (c) the fact that BMIS was audited by a small accounting firm, . . . as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 audit firms; (d) the fact that Madoff did not employ any third party administrators and custodians; . . . (e) the fact that Madoff lacked transparency and limited access to his books and records . . . ; and (f) the fact that Madoff admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance."  SAC ¶ 7.

The SEC and FINRA failed to catch Madoff's fraud.  In the SEC's investigation of its failure to catch Madoff, it noted that "numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was simply too risky."  SAC ¶ 90.  These include a number of hedge funds, advisors, and other entities.   Furthermore, Plaintiffs point to at least two articles published in the financial media that highlighted Madoff's returns and noted skeptics' concerns.  SAC ¶ 83.

## II.  Standard of Review

On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999).  "To survive dismissal, the plaintiff must provide

the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (internal quotation marks omitted).  Ultimately, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  "[A] simple declaration that defendant's conduct violated the ultimate legal standard at issue . . . does not suffice." *Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001).

Allegations of fraud must meet the heightened pleading standard of Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  An ample factual basis must be supplied to support the charges." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal citations omitted).

On a motion to dismiss, a court is not limited to the four corners of the complaint; a court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

### III. Discussion

#### a. Federal Securities Fraud Claims Against the FMC Defendants

Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), prohibits conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." *Field v. Trump*, 850 F.2d 938, 946–47 (2d Cir. 1988). Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." *Id.* The SEC rule implementing the statute, Rule 10b-5, prohibits "mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to state a securities fraud claim under Section 10(b), a "plaintiff must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("*ECA*") (quoting *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir. 2003)).

Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z-1, 78u-4. *See ATSI Commc'ns*, 493 F.3d at 99. Under the PSLRA, the Complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, with intent "to deceive, manipulate or defraud." 15 U.S.C. § 78u-4(b)(1), (2). "Therefore, '[w]hile we normally draw reasonable inferences in the non-

11

movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)). The FMC Defendants move to dismiss Plaintiffs' claims on the basis that they do not adequately plead scienter, an actionable misrepresentation, reasonable reliance, and loss causation.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks and citation omitted). "[T]he facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *ECA*, 553 F.3d at 197 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001)).

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The Court must consider "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 314. In determining whether a plaintiff adequately pleads scienter, the court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

Scienter can be shown by (1) demonstrating that a defendant had motive and opportunity to commit fraud, or (2) providing evidence of conscious recklessness.  *See South Cherry*, 573 F.3d at 108–09.  Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence."  *South Cherry*, 573 F.3d at 109 (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)).  Recklessness is "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Novak,* 216 F.3d at 308.

Plaintiffs allege scienter based on both motive and opportunity to commit fraud and conscious recklessness.  Plaintiffs' essential contention is that the FMC Defendants, motivated by their own self-interest in obtaining "exorbitant and unique fees and commissions," were willfully blind to the numerous red flags that would undoubtedly have led to the discovery of Madoff's fraud or, at the very least, to a determination that it was unwise to invest in BMIS.  Alternatively, they allege the FMC Defendants knew or, but for their extreme recklessness, should have known of a number of "red flags" regarding their Madoff investments but took no action to investigate or disclose the risk.

Plaintiffs' argument based on motive and opportunity is misguided.  "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [defendant] or its officers 'benefited in some concrete and personal way from the purported fraud.'"  *ECA*, 553 F.3d at 197 (quoting *Novak,* 216 F.3d at 307–08).  Plaintiffs allege the FMC Defendants benefited because they received fees of 1.4% of the FM Fund's net asset value.  However, Plaintiffs fail to allege facts that demonstrate these fees are exorbitant or at all in excess of the industry standard.  The desire to maintain high compensation in such circumstances

13

does not constitute motive for the purposes of this inquiry.  *ECA*, 553 F.3d at 197 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); *see also Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 620–21 (S.D.N.Y. 2010) (finding economic interest in retaining clients not probative of motive to ignore Madoff's fraud); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008) (holding that in pleading scienter, "arguing that the motive for defrauding investors was to increase the company's profits or to increase officer compensation is not sufficient"), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 Fed. Appx. 404 (2d Cir. 2009).

Nor does the Court find the red flags so "extremely obvious" that the FMC Defendants, but for their extreme recklessness, should have recognized them and taken steps to investigate or disclose the risks.  Pls.' Opp'n 40.  Plaintiffs outline the numerous red flags that the FMC Defendants recklessly disregarded, including among others, Madoff's lack of transparency and "consistent investment returns," the discrepancy between Madoff's supposed trading activity and the open interest of index option contracts, that BMIS was audited by a small accounting firm, and the lack of third party administrators and custodians.  SAC ¶¶ 4–5.  Plaintiffs cursorily allege the FMC Defendants must have known of the red flags because they were detected by many investment professionals in the industry, and were "equally available to each" Defendant.[5]  Pls.' Opp'n 39.

---

[5] Plaintiffs also allege that FMC must have known about the red flags "[b]ecause of the relationship between the FMC Defendants and the Andover-Beacon and Maxam Defendants."  Yet Plaintiffs do not provide factual allegations to support this contention. There is no allegation the FMC Defendants knew that the Andover, Beacon and Maxam Defendants were not conducting due diligence.  In fact, Plaintiffs recognize that the Investment Advisory Agreements signed by Beacon, Andover, and Ivy were "secretly amended to provide that Ivy's

"[P]laintiffs do not assert that the [Defendants] knew that Madoff's returns could not be replicated by others, and [P]laintiffs do not claim that investors who elected not to deal with Madoff informed the [Defendants] of their decisions."  *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010).  As this Court and other courts considering similar red flag allegations in the aftermath of the Madoff affair have found, Plaintiffs' allegations are insufficient to establish scienter.  *See Id.*; *S.E.C. v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) (rejecting scienter allegations because "the complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators").  In *Cohmad*, the SEC alleged scienter based on (1) a compensation arrangement that encouraged defendants to induce investors to invest in BMIS and discourage investors from withdrawing investments; (2) Madoff's requests for secrecy and defendants' compliance with that request; (3) Cohmad's failure to disclose the full extent of its relationship with BMIS in its regulatory filings and books and records, and the defendants' knowledge that BMIS failed to register them as associated with BMIS; and (4) one defendant's receipt of "outsized returns."  *Cohmad*, 2010 WL 363844, at *3–5.  Judge Stanton rejected all four of these arguments and found that "whether considered individually or collectively, [the allegations] do not show that defendants knew of, or recklessly disregarded, Madoff's fraud."  *Id.* at *3.  Plaintiffs in the instant case offer a no more convincing basis for Defendants' alleged knowledge than that rejected in *Cohmad*.

Plaintiffs do not allege that FMC had access to additional information that was not available to other financial professionals.  Rather, Plaintiffs' red flag theory is essentially that rejected by the Court of Appeals for the Second Circuit in *South Cherry*: had BAMC

---

responsibility for analyzing, monitoring and evaluating outside investment managers would exclude Madoff."  Pls.' Opp'n 40.

investigated Madoff, it would have uncovered that he was a fraud.  *See* 573 F.3d at 112 (rejecting

scienter allegations when the "[c]omplaint alleged that '[i]f' [defendant] had asked various

questions earlier, it would have further questioned the Bayou Accredited financial records or

recognized the need to ask further questions").  For twenty years, Madoff operated this fraud

without being discovered and with only a handful of investors withdrawing their funds as a result

of their suspicions.  The actions of the minority cannot support an inference of intent to defraud

as to the numerous other investors who were still in the dark.  An inference of scienter here is

simply not as cogent and compelling as the "opposing inference of nonfraudulent intent."

*Tellabs,* 551 U.S. at 314.  Accordingly, the FMC Defendants' motion to dismiss Count I is

granted.

Because section 20(a) liability requires "a primary violation" under section 10(b), the

section 20(a) claims against Zises and Tessler (Count II) are also dismissed.  *ATSI Commc'ns*,

493 F.3d at 108 (holding section 20(a) requires (1) "a primary violation by the controlled

person," (2) "control of the primary violator by the targeted defendant," and (3) that the

"controlling person was in some meaningful sense a culpable participant in the fraud

perpetrated" (internal quotation marks omitted)).

### b.  Direct State Law Claims Against All Defendants

Plaintiffs assert multiple state law claims directly as a class, including common law fraud

(Count III), negligent misrepresentation (Count IV), breach of fiduciary duty (Count V), gross

negligence and mismanagement (Count VI), unjust enrichment (Count VII), malpractice and

professional negligence (Count VIII), and aiding and abetting breach of fiduciary duty (Count

IX).  Defendants assert that most of these claims are precluded[6] by the Securities Litigation

Uniform Standards Act ("SLUSA"), Pub. L. No. 105–353, 112 Stat. 3227 (1998) (codified as

amended at 15 U.S.C. § 78bb).[7]

SLUSA was enacted in 1998 to prevent class action plaintiffs from circumventing the

PSLRA's heightened pleading requirements through artful pleading.  *Ring v. AXA Fin., Inc.*, 483

F.3d 95, 97–98 (2d Cir. 2007) (describing history of PSLRA and SLUSA).  SLUSA preclusion

has essentially four components: (1) the suit must be a "covered class action"[8]; (2) the action

must be based on state or local law; (3) the action must concern a "covered security"; and (4) the

defendant must have misrepresented or omitted a material fact or employed a manipulative

device or contrivance "in connection with the purchase or sale" of that security.  *Barron v.*

*Igolnikov*, No. 09 Civ. 4471 (TPG), 2010 WL 882890, at *4 (S.D.N.Y. Mar. 10, 2010) (citing

*Felton v. Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684, 690–91 (S.D.N.Y. 2006)).  If

an action satisfies these criteria, the defendant may remove it to federal district court, which must

dismiss the action.  15 U.S.C. § 78bb(f)(1); *Ring*, 483 F.3d at 98.

It is undisputed that the class action here is "covered" and that Plaintiffs assert state law

claims.  Plaintiffs argue that SLUSA preclusion does not apply because Defendants'

---

[6] SLUSA does not actually preempt any state cause of action, but denies plaintiffs the right to use the class action device to vindicate certain claims.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 87 (2006) ("The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.").

[7] SLUSA reads, in pertinent part:
> No covered class action based upon the statutory or common law of any State or subdivision
> thereof may be maintained in any State or Federal court by any private party alleging—
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a
> covered security; or
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in
> connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb.  Defendants also assert these claims are preempted by the Martin Act.  Because the claims are precluded under SLUSA, the Court will not address this argument.

[8] A covered class action is a lawsuit in which damages are sought on behalf of more than 50 prospective class members and common questions of law or fact predominate over questions affecting only individual members of the class. 15 U.S.C. § 78bb(f)(5)(B)(i)(I).

representations were made in connection with limited partnership interests, which they assert are not "covered securities"; thus, SLUSA's "in connection with" requirement is not met. Furthermore, they assert the state law claims for unjust enrichment and aiding and abetting breach of fiduciary duty do not sound in fraud.

A "covered security" includes any security that is listed or authorized for listing on the New York Stock Exchange or another national exchange, as well as securities issued by investment companies registered with the SEC. *See* 15 U.S.C. § 77r(b). The "in connection with" requirement is given broad construction. In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, the Supreme Court held that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else." 547 U.S. 71, 85–86 (2006) (noting "presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment") (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)).

As this Court recently held in *In re Beacon Associates*, misrepresentations related to non-covered limited partnership interests may be nonetheless "in connection with" covered securities where the Funds were created for the purpose of investing in such securities, and the misrepresentations "had the effect of facilitating Madoff's fraud." *In re Beacon Assocs. Litig.*, No. 09 Civ. 777 (LBS), 2010 WL 3895582, at *34 (S.D.N.Y. Oct. 5, 2010); *see also Levinson v. PSCC Services, Inc.*, No. 3:09-CV-00269 (PCD), 2009 WL 5184363, at *11 (D. Conn. 2009) (considering the "nature of the parties' relationship, and whether it necessarily involved the purchase and sale of securities") (citing *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 302 (3d Cir. 2005)). There is "no question that Madoff's Ponzi scheme was 'in connection with' the purchase and sale of securities." *Levinson*, 2009 WL 5184363, at *9. Madoff told investors

18

that he would purchase and sell securities in the Standard & Poor's 100 Index, and he used prices from the public markets on the trade documentation he sent to customers. *Barron*, 2010 WL 882890, at *5. That the trades never took place does not preclude finding a connection. *See id.*; *see also Schnorr v. Schubert*, No. 05 Civ. 303, 2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005) (precluding claims under SLUSA where defendant engaged in Ponzi scheme by promising to invest putative class's money in nationally listed and traded securities but never actually executed any trades). This holding is in keeping with those of other courts considering the issue in the context of the Madoff affair. *See Levinson*, 2009 WL 5184363, at *11 (finding defendant's misrepresentations did so coincide); *Barron*, 2010 WL 882890, at *5 (same).

Although the shares of the FM Fund are not covered securities, the objective of the Fund was to manage Plaintiffs' investment using multiple strategies, including substantial investment in a "large cap strategy" that explicitly involved the purchase and sale of covered securities. SAC ¶¶ 96–98, 105–109. That the Fund was invested in other funds engaged to adopt that strategy does not compel a different result, particularly where the FM Fund expected its Feeder Funds to pursue the same objectives. *See Dommert v. Raymond James Fin. Servs., Inc.*, No. 06 Civ. 102, 2007 WL 1018234, at *11 (E.D. Tex. Mar. 29, 2007) (finding "in connection" requirement met where purpose of investment agreements was to "utilize [the plaintiff's] assets and expand upon those assets, presumably with the purchase and sale of securities"). Here, Plaintiffs allege misrepresentations in the offering materials of all Fund Defendants regarding due diligence, monitoring of investments, and investment strategies, including the performance and feasibility of Madoff's purported trading strategy utilizing indisputably covered securities.[9]

---

[9] Because Counts VII and IX arise from the alleged misrepresentations and omissions by the Defendants with respect to their investment strategies and supervisory services, they too sound in fraud for the purposes of SLUSA. *See Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) ("A

These allegations are sufficient to meet SLUSA's broad requirement of a misrepresentation or omission in connection with the purchase or sale of a covered security.  Plaintiffs' direct state law claims are dismissed.[10]

### c.   Derivative Claims Against All Defendants

Defendants assert that the remaining claims (Counts X to XVIII), as well as the state law claims asserted directly, are derivative claims, which Plaintiffs lack standing to bring.  Nominal Defendant FM Fund asserts that each is premised on injuries suffered by the FM Fund, and that it alone has standing to bring such claims absent Plaintiffs' demonstration of demand futility.

"A shareholder derivative suit is a uniquely equitable remedy in which a shareholder asserts on behalf of a corporation a claim belonging not to the shareholder, but to the corporation."  *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991) (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).  Because "the decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation," *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990), the decision belongs to the General Partner.  Thus, a limited partner may bring an action to recover a judgment in favor of the partnership if the general partner has refused to do so "or if an effort to cause those general partners to bring the action is not likely to succeed."  Del. Code Ann. Tit. 6, § 17-1003 (2006); *see also Laties v. Wise*, 2005 WL 3501709, at *1 (Del. Ch. Dec. 14, 2005) (holding shareholder lacks standing under Delaware law to maintain such a claim unless he "first exhausts all

---

claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim.").

[10] Plaintiffs request leave to replead any dismissed claims.  In this case, such attempt would be futile with respect to nearly all of Plaintiffs' claims given the Court's ruling on standing *infra* p. 24.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) ("One good reason to deny leave to amend is when such leave would be futile." (citing *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979)).  Leave to replead is denied.

intracorporate remedies by making a demand on the board of directors to obtain the action desired, or by pleading with particularity why demand should be excused.").

The question of standing to bring a derivative suit is governed by the law of the state of organization.  *See Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009) ("The underlying demand requirement . . . in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation[,] clearly is a matter of 'substance,' not 'procedure.'  It is therefore governed by state law." (internal citations and quotation marks omitted)).  The FM Fund is a Delaware limited partnership, and the parties, as well as the Court, agree Delaware law governs its internal affairs.

"Before limited partners may bring a derivative claim in The Court of Chancery, Delaware law requires the plaintiffs to make a demand on the general partner to bring the action or explain why they made no demand."  *Seaford Funding Ltd. P'ship v. M & M Assocs. II, L.P.*, 672 A.2d 66, 69 (Del. Ch. 1995) (citing 6 Del. C. § 17-1001[11]; *Litman v. Prudential-Bache Props., Inc.,* 611 A.2d 12, 17 (Del.Ch. 1992) ("*Litman I*").  According to Delaware law, "the determination of whether a fiduciary duty lawsuit is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases."  *Litman I*, 611 A.2d at 15.

The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative in its decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc*, 845 A.2d 1031 (Del. 2004); *see also Albert v. Alex Brown Mgmt. Servs.*, 2005 WL 2130607, at *12

---

[11] Section 17-1001 states:
> A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

(Del. Ch. Aug. 26, 2005) (noting the revision).[12]   The *Tooley* test provides that determining whether a claim is direct or derivative "turn[s] solely on the following questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."  *Tooley*, 845 A.2d at 1033.  "The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation."  *Id.* at 1039.

The Court should not merely rely on "plaintiff's characterization of his claims in the complaint, but . . . must look to all the facts of the complaint and determine for itself whether a direct claim exists."  *San Diego Cnty. Emps. Ret. Ass'n v. Maounis,* No. 07 Civ. 2618, 2010 WL 1010012, at *19 (S.D.N.Y. Mar. 15, 2010) (quoting *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del. Ch. 2004)) (citing *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del. Ch. 2004) ("[U]nder *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint.")).  However, "there is no reason that some claims arising out of a case or controversy could not be direct while other claims arising out of that case or controversy are properly derivative."  *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d

---

[12] Plaintiffs cite a line of Delaware authority holding that when the structure of a limited partnership deviates dramatically from the corporate model, claims that could only be brought derivatively in the corporate context can be brought directly.  *In re Cencom Cable Income Partners, L.P.*, No. C.A. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000); *Anglo American Sec. Fund, L.P., v. S.R. Global Intern. Fund, L.P.*, 829 A.2d 143 (Del. Ch. 2003).  These cases were decided before *Tooley*.  Even assuming the cases remain good law, Plaintiffs do not adequately allege that the FM Fund limited partnership differs so drastically from the corporate model.  Unlike the Plaintiffs in *Anglo-American*, all of the FM Fund's limited partners were injured in an identical way, and any potential recovery would be distributed to them on a pro rata basis.  *Cf. Anglo American*, 829 A.2d at 152–53 (allowing claims to be brought directly because plaintiff had left the fund, and partners admitted after the reduction in value suffered no injury, thus derivative claims would "have the perverse effect of denying standing (and therefore recovery) to parties who were actually injured by the challenged transactions while granting ultimate recovery (and therefore a windfall) to parties who were not"); *see also Ernst & Young Ltd. v. Quinn*, 09-cv-1164 (JCH), 2009 WL 3571573, at *9 (D. Conn. Oct. 26, 2009) (declining to follow *Anglo American* where "redemptions in [the fund] have been frozen, and the state plaintiffs remain members of the Fund").

599, 610 (S.D.N.Y. 2010) (citing *Grimes v. Donald*, 673 A.2d 1207, 1212–13 (Del. 1996)

("[T]he same set of facts may result in direct and derivative claims.")).  Accordingly the Court

addresses whether each of Plaintiff's claims is direct or derivative in turn.

### i. Claims Alleged as Direct Against All Defendants

Nominal Defendant FM Fund asserts that each direct claim alleged against Defendants is

premised on injuries suffered by the Fund.  These claims have already been dismissed as

precluded by SLUSA.  Even if they were permitted to proceed, however, most would be

dismissed as derivative claims for which Plaintiffs have not sought demand.  *Haber v. Bell*, 465

A.2d 353, 357 (Del.Ch.1983) (holding derivative claims must be dismissed if party brings them

without first making demand, and demand is not excused).

Using the *Tooley* test, Plaintiffs' direct claims for breach of fiduciary duty, gross

negligence and mismanagement, malpractice and professional negligence, unjust enrichment,

and aiding and abetting breach of fiduciary duty are derivative in nature, despite Plaintiffs'

attempt to plead them as direct.  Each is based on the alleged mismanagement of the FM Fund

through the failure to conduct adequate due diligence and to discover and act upon red flags.  "A

claim for deficient management or administration of a fund is 'a paradigmatic derivative claim.'"

*Albert v. Brown Mgmt. Serv.*, 2005 WL 2130607, at *12–13 (holding gross negligence and

failure to provide competent and active management "clearly derivative" where "[t]he gravamen

of these claims is that the Managers devoted inadequate time and effort to the management of the

Funds, thereby causing their large losses." (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348,

353 (Del. 1988) ("A claim of mismanagement . . . represents a direct wrong to the corporation

that is indirectly experienced by all shareholders.")); *see also Litman I*, 611 A.2d at 15–16

(holding claim derivative where "[t]he gist of plaintiffs' complaint is that the general partners

breached their fiduciary duties by inadequately investigating and monitoring investments and by placing their interests in fees above the interests of the limited partners.").

Plaintiffs' arguments essentially mirror those in the section 10(b) claim, to wit, that the FMC Defendants knew or should have known Madoff was a fraud based on red flags that Plaintiffs allege Defendants should have discovered and would have been unable to ignore. Assuming such acts were a breach of duty, the continued investment of FM Fund in Madoff's Ponzi scheme would necessarily injure the Fund. *Stephenson*, 700 F. Supp. 2d at 610–11 ("If, as alleged, defendants breached a fiduciary duty by not discovering that Greenwich Sentry's accounts were invested in what would become the most infamous Ponzi scheme in recent history, it necessarily injured Greenwich Sentry in so doing."). Plaintiff "cannot prevail on this claim without showing injury to the partnership [Defendant] itself, and accordingly the claim is derivative." *Id.* (finding breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims derivative where "[t]he gravamen of plaintiff's breach of fiduciary duty claims is a failure to administer the fund such that the Madoff Ponzi scheme would be discovered." (citing *Albert v. Alex Brown Mgmt. Servs.*, 2005 WL 2130607, at *13)). The diminution in the value of partnership interests clearly is not a direct injury, because "[t]he diminution in the value of their interests flows from the damage inflicted directly on the Partnership." *Litman I*, 611 A.2d at 16. These claims may only be brought, if at all, derivatively. As such, they are dismissed.[13]

However, Plaintiffs' common law fraud and negligent misrepresentation claims against the FMC Defendants are both direct only to the extent they allege inducement, to wit, "that they allege (1) violation of a duty owed to potential investors at large and (2) that such violations

---

[13] That Plaintiffs do in fact bring substantively identical claims against the FMC Defendants derivatively lends further support for dismissal. *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) (dismissing claims brought as direct where "the damages allegedly flowing from the purportedly direct claim . . . are exactly the same as those suffered by the corporation in the underlying derivative claim").

induced plaintiff to invest in [the Fund]." *Stephenson*, 700 F. Supp. 2d at 611–612 (finding gross negligence, negligence, and fraud claims direct to the extent they alleged inducement). Plaintiffs assert they relied on the FMC Defendants' statements in the OMs and other documents when deciding to purchase and retain limited partnership interests in the FM Fund. SAC ¶¶ 261, 266. "[R]ecovery on a claim based solely on inducement would only flow to those individuals, such as [Plaintiffs allege they were], who were so induced." *Id.*; *see also Albert v. Alex Brown Mgmt. Servs.*, 2005 WL 2130607 at *12 (finding breach of contract and breach of fiduciary duty claims both based on failure to disclose were direct claims because holders "either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests"). Were these claims adequately pleaded, an issue of which there is some doubt, and not precluded as class claims under SLUSA, Plaintiffs would be permitted to bring them directly.

### ii.  Claims Alleged as Derivative Against All Defendants

As to the claims brought derivatively[14] on behalf of the FM Fund, Defendants assert that Plaintiffs have not met the demand requirement, that demand is not excused, and that the claims must therefore be dismissed. Plaintiffs acknowledge that they made no pre-suit demand on FMC.

In determining the sufficiency of a complaint to withstand dismissal based on a claim of demand futility, the court must decide "(1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the

---

[14] No party objects to the classification of these claims at derivative.  However, the Feeder Fund Defendants argue that the FM Fund also lacks standing to sue.  Because demand was not excused with regard to the FM Fund, *see infra* p. 29, the Court expresses no opinion on this issue.

25

product of a valid exercise of business judgment." *Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991); *see Litman v. Prudential-Bache Props., Inc*., CIV. A. No. 12137, 1993 WL 5922, at *2–3 (Del. Ch. Jan. 4, 1993) ("*Litman II*") (applying the rational utilized in *Levine* to a derivative claim in the partnership context). Plaintiffs' pleading burden in the demand context is "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss." *Levine*, 591 A.2d at 207 (citing *Grobow v. Perot*, 539 A.2d 180, 187 n. 6 (Del. 1988)); *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (holding plaintiffs must provide particularized allegations as to why demand would be futile to survive a motion to dismiss; conclusory allegations are not enough).

As to independence and disinterest, Plaintiffs must plead particularized facts creating "a reasonable doubt that, as of the time the complaint is filed, the [general partner] could have properly exercised its independent and disinterested business judgment in responding to a demand." *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). In the instant case, Plaintiffs argue the FM Fund's General Partner, Defendant FMC, is not independent and disinterested because it benefited from the transaction at issue, and because it faces a substantial likelihood of liability.[15]

Plaintiffs rightly assert that Defendants may be interested where they derive a benefit at the expense of the limited partnership. *See Bakerman v. Sidney Frank Importing Co., Inc*., 2006 WL 3927242, *7 (Del. Ch. 2006) ("Disinterested means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of

---

[15] Plaintiffs assert that demand should not be required "where a partnership's business is complete, and the only parties to the partnership were now clearly adversaries." P's at 115 (citing *Cencom*, 2000 WL 130629, at *4). In *Cencom* the limited partnership at issue no longer existed. Here, although the limited partnership is being dissolved, the general partner, FMC, is still in the process of seeking redemptions. In *Cencom* the only claims at issues in the matter were against the dissolved limited partnership, and the claim related directly to the liquidation of that partnership. That is simply not the case here, as there are multiple claims against numerous entities besides the general partner.

self-dealing." (internal quotation marks omitted)).  However, that Defendants received

"substantial commissions, fees and other payments" does not suffice to show Defendants were

interested absent particularized facts demonstrating excessiveness of the fees or irregularity in

their receipt.  *Litman II*, 1993 WL 5922, at *3–4.  Only when the fee at issue "becomes so lavish

that a mechanical application of the presumption [of director disinterest] would be totally at

variance with reality" is there a need to excuse the demand requirement.  *Grobow v. Perot*, 526

A.2d 914, 923, n.12 (Del. Ch. 1987).  Plaintiffs categorically allege Defendants' fees were

"excessive" but fail to plead facts demonstrating they were anything but consistent with industry

practice.  The cases cited by Plaintiffs, *In re E-Bay, Inc. S'holders Litig.*, No. C.A. 19988-NC,

2004 WL 253521, at *2 (Del. Ch. Jan. 23, 2004) (finding demand futility where directors who

had received shares of an IPO in what was alleged to be usurpation of corporate opportunity

were "clearly interested"); *Bakerman v. Sidney Frank Importing Co.*, No. Civ. A. 1844-N, 2006

WL 3927242, at *8 (Del. Ch. Oct. 10, 2006) (finding it too early to apply weighing analysis as to

defendants' benefit at the expense of the LLC where defendants appeared on both sides of a

transaction because of their holdings in outside company to which funds were allocated), are

inapplicable where, as here, the benefit was in the form of regular advisory fees paid to the

general partner.

Plaintiffs next assert that demand should be excused because Defendants face a

substantial likelihood of liability.  "The mere threat of personal liability for approving a

questioned transaction, standing alone, is insufficient to challenge either the independence or

disinterestedness of directors."  *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (citing *Gimbel

v. Signal Cos., Inc.*, 316 A.2d 599 (Del. Ch.), *aff'd,* 316 A.2d 619 (Del. 1974)).  Rather, the

transaction must "be so egregious on its face that board approval cannot meet the test of business

judgment, and a substantial likelihood of director liability therefore exists." *Id.* Similarly, the Delaware Supreme Court has rejected the notion that "approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them." *Aronson*, 473 A.2d at 814.

The remaining claims under which FMC could potentially face liability include derivative claims for breach of fiduciary duty (Count X) and unjust enrichment (Count XVII). Plaintiffs would face two barriers to liability were these claims permitted to go forward. First, the FM LPA and FM OM contained exculpatory provisions that limit Defendant FMC's liability to acts of bad faith, gross negligence, fraud, or willful misconduct. FM LPA § 5.5.1; *see Seminaris v. Landa*, 662 A.2d 1350, 1354–1355 (Del. Ch. 1995) (where plaintiffs alleged defendants failed to supervise director and employees, "plaintiff will have to demonstrate that [defendants] were grossly negligent" and claim that defendants "looked the other way" did not "describe such egregious conduct by the directors that they face a substantial likelihood of liability due to their failure to prevent [director's] misrepresentations"). Second, because these claims are based on substantially the same acts alleged to constitute securities fraud under section 10(b), they are likely preempted by the Martin Act.[16] For these reasons, Plaintiffs are unable to demonstrate a substantial likelihood of liability.

Finally, Plaintiffs allege that the decision to invest in the Feeder Funds without proper investigation could not have been a product of valid business judgment. This assertion is based

---

[16] The Martin Act preempts common law securities claims sounding in fraud or deception that do not require pleading or proof of intent, and that are based on conduct that is "within or from" New York. *Barron*, 2010 WL 882890, at *5 (citing *Owens v. Gaffken & Barringer Fund, LLC*, No. 08 Civ. 8484 (PKC), 2009 WL 3073338, at *12 (S.D.N.Y. Sept. 21, 2009)). In *In re Beacon Associates*, this Court found similar claims against Ivy and the Beacon Fund were preempted. *In re Beacon Assocs. Litig.*, 2010 WL 3895582, at *38.

28

on the theory that Defendants should have known or discovered that Madoff was a fraud, a theory which Plaintiffs do not adequately plead.

Plaintiffs here are not left without remedy.  The FM Fund is currently a class member in a suit against the Beacon, Ivy, and BONY Defendants, including the individuals Simon, Danzinger, and Markhoff, which recently survived a motion to dismiss.  *In re Beacon*, 2010 WL 3895582.  Plaintiffs offer no reason why Defendant FMC could not exercise its business judgment to determine whether the Fund should continue as a class member rather than bring an independent suit.  Nor do they provide convincing reasons why Defendant FMC cannot exercise its business judgment as general partner to determine whether the FM Fund should pursue claims against the Maxam and Andover Defendants.

Because Plaintiffs do not satisfy the demand requirement, the derivative claims against all Defendants on behalf of the FM Fund are dismissed.

## IV. Conclusion

For the reasons set forth herein, the Court grants Defendants' motion to dismiss the Complaint in its entirety.

SO ORDERED.


Dated:  October 20, 2010

      New York, NY

U.S.D.J.

29